# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AKZO NOBEL COATINGS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 8666-VCP |
| THE DOW CHEMICAL COMPANY, | ) | |
| (*doing business as DOW ADVANCED MATERIALS*), | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 13, 2015
Date Decided: June 5, 2015

Michael P. Kelly, Esq., Daniel J. Brown, Esq., Daniel M. Silver, Esq., McCARTER & ENGLISH, LLP, Wilmington, Delaware; Michael D. Loughnane, Esq., KENYON & KENYON LLP, New York, New York; *Attorneys for Plaintiff.*

Rodger D. Smith, II, Esq., Leslie A. Polizoti, Esq., Ryan D. Stottmann, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; David Lender, Esq., WEIL, GOTSHAL & MANGES LLP, New York, New York; *Attorneys for Defendant.*

**PARSONS, Vice Chancellor.**

This is a dispute between two chemical companies that were parties to a joint development agreement. The plaintiff alleges, among other things, that the defendant breached the joint development agreement and wrongfully misappropriated intellectual property that belongs in part or in whole to the plaintiff. The defendant has moved to dismiss. For the reasons that follow, the motion to dismiss is granted in part and denied in part. Specifically, the plaintiff's claims for breach of contract and misuse of its confidential information survive, but its alternatively pled claims for breach of the implied covenant of good faith and fair dealing, conversion, and unjust enrichment are dismissed.

## I.   BACKGROUND[1]

Plaintiff, Akzo Nobel Coatings Inc. ("Akzo"), is a Delaware corporation with its principal place of business in Strongsville, Ohio. Akzo specializes in the design, manufacture, and sale of various chemical coatings, including protective coatings for food and beverage packaging and containers. Defendant, The Dow Chemical Company, doing business as Dow Advanced Materials ("Dow"), is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Among other things, Dow develops, manufactures, and sells polymeric materials, products, and technologies, including those suitable for use in coatings for food and beverage containers.

---

[1]   The facts are drawn from the allegations in the plaintiff's Verified Complaint (the "Complaint"), which are assumed true for purposes of the defendant's motion to dismiss.

1

On January 25, 2010, the parties executed a Joint Development Agreement ("JDA").[2] The provisions of the JDA are analyzed in detail in Section III.A *infra*. In general and simplified terms, the purpose of the JDA was to combine the parties' respective areas of expertise in pursuit of the development of new protective coatings for metal beverage and food packaging containers. The resulting output of any given project under the JDA could be owned wholly by one of the two parties, depending on whether it was a Target-Coating,[3] which would be owned by Akzo, or a Material or Project Material, either of which would belong to Dow. Any other output not falling into those specific categories would be jointly owned. The Complaint also alleges that, in the course of pursuing the various projects begun under the JDA, Akzo disclosed confidential information to Dow.

On or about October 24, 2011, Dow provided Akzo with a notice of termination. The JDA, by its own terms, terminated ninety days later.[4] On or about May 18, 2012, Dow communicated to Akzo that it intended to file two patent applications relating to

---

[2]     Compl., Ex. A [hereinafter "JDA"]. The JDA also included several addenda as Exhibit A, which became "incorporated into [the] JDA" upon signature by the parties. The addenda were attached as Exhibit 1 to Dow's Motion to Dismiss. Consideration of the JDA and its addenda is appropriate on Defendant's motion because those documents are integral to the Complaint. *See, e.g.*, *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013); *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168-69 (Del. 2006).

[3]     Unless otherwise specified, capitalized terms referenced in this Memorandum Opinion have the same meaning as in the JDA. Those definitions are described in Section III.A *infra*.

[4]     JDA ¶ 9.5.

2

potential JDA-Inventions (the "Patent Applications"). The Complaint alleges that the Patent Applications disclose "coating compositions, applications and forming coated containers or closure devices,"[5] including Akzo's confidential information regarding "polyolefin dispersions, acrylic latex emulsions and the use of phenol formaldehyde."[6] Akzo objected to Dow's proposed Patent Applications on or about June 12, 2012. According to Akzo, Dow did not cooperate with Akzo to determine the appropriate manner to proceed with the Patent Applications; instead, it acted unilaterally, in violation of the JDA. Dow modified the Patent Applications to some extent before they were to become public in or around mid-December 2013.

Akzo filed its Complaint on June 20, 2013. The Complaint consists of five Counts, asserting claims for: (1) a declaratory judgment regarding Akzo's ownership rights under the JDA; (2) breach of contract and a permanent and mandatory injunction against Dow, requiring Dow to transfer the appropriate ownership rights associated with the Patent Applications to Akzo; (3) breach of the implied covenant of good faith and fair dealing; (4) conversion; and (5) unjust enrichment. Dow moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). After full briefing, I heard argument on January 13, 2015 (the "Argument") and took the matter under advisement.

---

[5] Compl. ¶ 21.

[6] *Id.* ¶ 22.

3

## II.  STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[7] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[8] This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[9] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[10] Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[11]

Generally, the court will consider only the pleadings on a motion to dismiss under Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1)

---

[7]   *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[8]   *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[9]   *Id.* at 537 & n.13.

[10]  *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[11]  *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

4

the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[12]

## III. ANALYSIS

At its core, this case concerns the meaning of the JDA. The interpretation of a contract is a question of law.[13] "[D]efendants are not entitled to dismissal under Rule 12(b)(6) unless the interpretation of the contract on which their theory of the case rests is the 'only reasonable construction as a matter of law.'"[14] If there is more than one reasonable construction of contractual language, then the contract is ambiguous.[15] But, contractual language "is not ambiguous simply because the parties disagree on its meaning."[16] Instead, the court will apply standard principles and canons of contract interpretation in construing the contract. I begin with the JDA's terms, briefly describe Dow's patent claims, and then analyze the five Counts in the Complaint.

---

[12] *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

[13] *See, e.g.*, *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)); *see also AHS N.M. Hldgs., Inc. v. Healthsource, Inc.*, 2007 WL 431051, at *3 (Del. Ch. Feb. 2, 2007) ("Under general principles of contract law, interpretation of contractual language is purely a question of law.").

[14] *Kahn v. Portnoy*, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

[15] *VLIW Tech.*, 840 A.2d at 615 ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

[16] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

### A. The JDA

The JDA sought to combine Dow's expertise in polymeric materials and products with Akzo's expertise in protective coatings for metal beverage and food packaging containers. To that end, the parties attempted to set forth in the JDA the terms of their underlying rights and obligations. Various addenda to the JDA defined the scope and goals of the specific joint projects that the parties undertook. Numerous provisions from the JDA, which is governed by Delaware law,[17] are pertinent to this dispute.

### 1. Ownership provisions

Section 5.2 defines the parties' respective ownership rights as to JDA-Inventions. A JDA-Invention is

> any invention, whether patentable or unpatentable, that is:
>
> (a) a new Material (e.g., a new Project Material), and/or
> (b) a new article (e.g., a new Target-Coating) having a new structure and/or composition, and/or
> (c) any new method or apparatus for manufacturing Materials or Products, and/or
> (d) any new end-use for a Material or Product,
>
> which is first actually reduced to practice by a Party . . . alone or with others, and which reduction to practice occurs both during the Project Period and as a result of work performed in connection with that project.[18]

---

[17] JDA ¶ 10.5.

[18] *Id.* ¶ 11.13.

6

Akzo "owns those JDA-Inventions that are specific to: (1) the Target-Coating, (2) methods or apparatus for fabricating the Target-Coating, and (3) uses of the Target Coating."[19] Dow, on the other hand, "owns those JDA-Inventions that are specific to: (1) Materials and Project Materials, (2) methods or apparatus for manufacturing Materials and/or Project Materials, and (3) uses of Materials, and/or Project Materials."[20] Everything not falling into one of these categories is jointly owned by Dow and Akzo. For jointly owned inventions, neither party independently "may use for itself or license, assign, transfer, or otherwise grant third parties any rights . . . without the other Party's prior written consent, which shall not be unreasonably withheld."[21]

To prevail on its motion to dismiss, Dow must show that it is not reasonably conceivable that the items claimed in the Patent Applications could be anything other than a Material or a Project Material. Stated differently, if it is reasonably conceivable that the Patent Applications claim something other than a Material or a Project Material—*e.g.*, a Product, a Target Coating, or, potentially, something that does not fall within one of the other specified categories[22]—the motion to dismiss will be denied.

---

[19]     *Id.* ¶ 5.2(a).

[20]     *Id.* ¶ 5.2(b).

[21]     *Id.* ¶ 5.2(c).

[22]     This possibility appears to be contemplated by, *e.g.*, Paragraph 11.13(b), which describes the creation of "a new article," an undefined term. On this limited record, it is unclear whether the category of Products is coextensive with the category of items covered by Paragraph 11.13(b).

As Section 5.2 shows, the JDA contemplates three categories of potential JDA-Inventions: Materials or Project Materials, Target Coatings, and Products. The pertinent JDA definitions are as follows:

> "Material," as used with respect to a particular Project,[23] means (a) those particular polymeric materials (including but not limited to neat polymers and polymer blends, and also compounds, formulations, or articles containing or made from polymers or polymer blends, including but not limited to films, fibers, nonwovens, foams, or a combination thereof), as well as (b) any other chemicals or compositions useful with those polymeric materials, all as more specifically defined to be the "Material" in the corresponding Addendum.[24]
>
> "Project Material," as used with respect to a particular Project, means (a) any new Material first developed in and for that Project that enables the Parties to meet the Success Criteria of that Project, or (b) any other Material that the Parties otherwise mutually agree to designate as a 'Project Material' for that Project.[25]
>
> "Product" as used with respect to a particular Project, means an article of manufacture (other than a Material *per se*) that is fabricated from a Material by (a) transforming the structure of the Material *per se* (e.g., converting a resin pellet into a film), and/or (b) combining the Material with other structural

---

[23]   Project means "a particular program to be conducted by the Parties under this JDA to develop and commercialize a Target-Coating, as defined in the corresponding Addendum." *Id.* ¶ 11.23. There were four Addenda to the JDA and, accordingly, four Projects.

[24]   *Id.* ¶ 11.18.

[25]   *Id.* ¶ 11.26. Because neither party based its arguments on any contention that something was or was not a Project Material, I limit my discussion in this Memorandum Opinion of JDA-Inventions that might be owned by Dow solely to Materials.

8

components (e.g., laminating a Material [such as a film] to a separate structure [such as a nonwoven web]).[26]

Target Coatings are one type of Product: "'Target-Coating,' as used with respect to a Project, means that particular Product, as defined in the corresponding Addendum, that the Parties intend to develop in that Project, including meeting the performance requirements specifically defined in that Addendum."[27] The definition of Product encompasses more than just Target-Coatings, however. For example, a developed coating that fails to meet the performance specifications in the Addendum still would be a Product within the meaning of the JDA.

These definitions show that the defined terms are heavily dependent on the specific Projects, with each Project being described in detail in a corresponding Addendum. The JDA includes four such Addenda. All four Addenda identically list the specific Materials "that may be evaluated in this Project," and "other related components suitable for use in a Coating Formulation for the Target Application" as: "[1] Non-commercially available Bluewave[TM] WB Polyolefin Dispersions; [2] Non-commercially available Polyolefins (functionalized); [and] [3] Non-commercially available Polyolefins (unfunctionalized)."[28]

---

[26]    *Id.* ¶ 11.22.

[27]    *Id.* ¶ 11.32.

[28]    *Id.*, Addenda Nos. 1-4.

9

The termination of the JDA did not affect "the respective rights or obligations of either Party . . . under Articles 5, 6, 7 or 8, or under Paragraphs 2.1, 9.4, or 10.12."[29]

### 2.    Patenting and protection of JDA-Inventions

The JDA establishes a framework for determining into which ownership category a JDA-Invention falls.

> Reasonably promptly after a Party becomes aware that an invention has been conceived or first reduced to practice that may be a JDA-Invention, that Party must deliver to the other [Party] . . . a written description of the invention, as well as sufficient information to enable the Parties . . . to evaluate the inventorship of the same.  The Parties will attempt to reach a consensus on whether the same is a JDA-Invention and who is(are) the inventor(s).[30]

Akzo appears to construe this provision as meaning that a Project would have to be completed before a determination of ownership would be made.  The terms of Paragraph 5.4, however, do not seem to require completion of a Project before a party could attempt to claim a JDA-Invention.

After following the process described above, one or both of the parties could pursue a patent on a JDA-Invention.  The JDA contemplates that the parties would "focus on drafting patent applications on JDA-Inventions using the optimal claim structure in each case as appropriate, without considering who would own that patent application."[31]  The JDA contains further detailed provisions on patenting JDA-Inventions, which need

---

[29]    *Id.* ¶ 9.7(b).

[30]    *Id.* ¶ 5.4.

[31]    JDA ¶ 5.5.1.

10

not be examined here, except to note that the JDA requires the Parties to cooperate in the patenting of JDA-Inventions.[32] The contours of that cooperation presumably would vary depending on who owns the JDA-Invention and whether the parties are pursuing a Joint JDA-Patent.[33]

### 3. Confidentiality provisions

According to the JDA,

> "Confidential Information" . . . means Background Information[34] of the designated Party or its Affiliates (collectively the "Discloser"), as well as Project Information[35] first developed or discovered by that Discloser, which is disclosed or otherwise made available to the other Party and/or its Affiliates (collectively the "Recipient") under this JDA, except with respect to any particular Information that the Recipient can prove:
>
> > (a) was available to the public through no fault of Recipient, or

---

[32] *Id.* ¶ 5.5.3.

[33] *Id.*

[34] "'Background Information' . . . means any Information known, owned or controlled by that Party or its Affiliates prior to the Effective Date, as well as any Information is [sic] acquired or developed by or for that Party or its Affiliates independently of any Project, as evidenced by written records." *Id.* ¶ 11.4. "'Information' means technical or business information pertaining to (a) the composition, structure, and/or properties of any Material and/or Product . . . (b) any methods or apparatus for manufacturing Materials and/or Products, and/or (c) the use of a Material or Product in any end-use application." *Id.* ¶ 11.11.

[35] "'Project Information,' as used with respect to a particular Project, means any new Information, owned or controlled by either Party or by its participating Affiliates, that is first developed or acquired both (a) during the corresponding Project Period, and (b) in connection with work performed on that Project." *Id.* ¶ 11.25.

11

(b)	Recipient already possessed prior to receipt from Discloser, or

(c)	Recipient acquired from a Third Person, or otherwise holds, without obligation of confidence, or

(d)	was independently developed by or for Recipient by person(s) who did not have access to Discloser's Confidential Information or Samples.[36]

Article 7 imposes various obligations on the parties with respect to Confidential Information. For example, it provides that the parties "will cooperate to mark Information disclosed under this JDA that either Party considers to be confidential."[37] The parties also must exercise at least as much care with respect to the Discloser's Confidential Information as the Recipient uses with respect to its own such information.[38] Additionally, there are restrictions on disclosure and use:

> Until 5 years after the end (either completion or earlier termination) of a particular Project, each Recipient receiving a Discloser's Confidential Information in connection with that Project agrees that (a) Recipient will maintain that Confidential Information in confidence and prevent the disclosure of the same to others, and (b) Recipient will use that Confidential Information exclusively (b.1) for the Projects, and/or (b.2) to carry out its obligations under this JDA.[39]

---

[36]	*Id.* ¶ 11.6.

[37]	*Id.* ¶ 7.1.

[38]	*Id.* ¶ 7.3.

[39]	*Id.* ¶ 7.2.

The JDA does allow certain permitted disclosures, however, such as to the Recipient's legal counsel or as reasonably required for regulatory review by governmental agencies.[40]

### B.     The Patent Applications

The Patent Applications at issue here are U.S. Patent Application Nos. 72330 and 72705.[41]  The "Background of the Invention" section of each application makes clear that the patents relate to coatings for food and beverage containers and cans,[42] which was the focus of the JDA.  Akzo alleges that the inventions claimed in the Patent Applications belong to it or, in the alternative, belong to it and Dow jointly.  Dow contends that the polymer compositions claimed in the Patent Applications are Materials under the JDA and, therefore, belong solely to Dow.

---

[40]    *Id.* ¶ 7.4.

[41]    Patent Applications 72330 and 72705 are attached to the Complaint as Exhibits B and C, respectively.  Apparently, those documents are internal Dow drafts and differ in certain respects from the actual applications Dow ultimately filed with the United States Patent and Trademark Office (the "PTO").  The Patent Applications actually filed are attached as Exhibits 2 and 3 to Dow's Brief in Support of the Motion to Dismiss [hereinafter respectively Patent Application 72330 and Patent Application 72705].  The Patent Applications are integral to the Complaint.  Akzo contends that the differences between the draft Patent Applications and the filed versions are immaterial for purposes of Dow's motion.  Accordingly, I will refer to the applications as actually filed with the PTO.  Finally, I note for completeness that the Patent Application numbers used in this Memorandum Opinion are Dow's internal patent numbers, not the actual numbers given to the applications by the PTO.

[42]    Patent Appl. 72330 at 1-2; Patent Appl. 72705 at 1-2.

13

Although somewhat unwieldy, I consider it appropriate, based on the technical nature of patent claims, to include here the entire text of the first independent claim from each of the Patent Applications. Patent Application 72330's first claim is:

An aqueous based blend composition comprising:

[1] an aqueous polyolefin dispersion comprising the melt blending product of one or more base polymers and one or more stabilizing agents in the presence of water and optionally one or more neutralizing agents, wherein the polyolefin dispersion has an average volume particle size diameter in the range of from 400 to 1500 nm, and a pH range from 8 to 11; and

[2] an acrylic emulsion comprising acrylic solids having an average weight particle size diameter in the range of from 75 to 450 nm; an acid level in the range of from 0.25 to 5 percent by weight of acid monomers based on the weight of the acrylic monomer, and a weight average molecular weight in the range of from 200,000 to 5,000,000 g/mole, and a glass transition temperature ($T_g$) in the range of from 7 to 100° C, and wherein said acrylic emulsion has a pH in the range of from 7 to 9;

[3] wherein said aqueous based blend composition has a solid content in the range of from 15 to 70 percent by weight of solids, based on the weight of the aqueous based blend composition, wherein said solid content of said blend composition comprises from 20 to 95 percent by weight of the one or more base polymers, based on the weight of the solid content of the aqueous based blend composition and from 5 to 80 percent by weight of the acrylic solids, based on the weight of the solid content of the aqueous based blend composition, and a pH in the range of from 7 to 11.[43]

---

[43] Patent Appl. 72330 at 42.

Claim 1 of Patent Application 72705 reads:

An aqueous based blend composition comprising:

[1] an aqueous polyolefin dispersion comprising the melt blending product of one or more base polymers and one or more stabilizing agents in the presence of water and optionally one or more neutralizing agents, wherein the polyolefin dispersion has an average volume particle size diameter in the range of from 400 to 1500 nm, and a pH range from 8 to 11; and

[2] one or more crosslinking agents selected from the group consisting of phenolformaldehyde resins, hydroxyalkylamide resins, amino-formaldehyde resins; epoxy group containing resins, and combinations thereof, wherein said crosslinking agents comprise form [sic] 0.1 to 50 percent by weight based on the solid content of the dispersion;

[3] wherein said aqueous based blend composition has a solid content in the range of from 15 to 70 percent by weight of solids, based on the weight of the aqueous based blend composition, wherein said solid content of said blend composition comprises up to 99.9 percent by weight of the one or more base polymers, based on the weight of the solid content of the aqueous based blend composition . . . and a pH in the range of from 8 to 11.[44]

In sum, Patent Application 72330 claims, at least, a combination of two elements: (1) an aqueous polyolefin dispersion comprising (a) one or more base polymers and (b) one or more stabilizing agents and (c) optionally, one or more neutralizing agents; and (2) an acrylic emulsion. Patent Application 72705 also claims, at least, a combination of two elements: (1) an aqueous polyolefin dispersion comprising (a) one or more base polymers

---

[44] Patent Appl. 72705 at 35.

and (b) one or more stabilizing agents and (c) optionally, one or more neutralizing agents; and (2) one or more crosslinking agents.

### C. Declaratory Judgment and Breach of Contract

#### 1. Interpretation of the JDA

As noted, to succeed on its motion to dismiss, Dow must show that the Patent Applications do not claim anything besides a Material, such as a Product. In effect, Dow asks this Court to conclude, without expert testimony on technical issues of polymer chemistry and patent construction, that the Patent Applications claim only Materials. For the reasons that follow, I conclude that, even assuming Dow's interpretation of the JDA is reasonable, it is not the only reasonable interpretation of the JDA. Accordingly, dismissal of Counts I and II is not appropriate at this time.

Dow's position is that the items comprising the Patent Applications' claims are all Materials under the JDA and, therefore, are owned exclusively by it, with Akzo having no ownership rights. As stated in its brief, Dow reads Paragraph 11.18 of the JDA as "defining 'Materials' to include 'compounds, formulations, or articles containing or made from polymers or polymer blends, including but not limited to films, fibers, nonwovens, foams, or a combination thereof' and 'any other chemicals or compositions useful with those polymeric materials.'"[45] As applied to the quoted claims from the Patent Applications, Dow argues that the base polymers and the acrylic emulsion are "polymers or polymer blends" and the stabilizing agents and crosslinking agents are "chemicals or

---

[45] Dow's Opening Br. 11.

16

compositions useful with those polymeric materials." Dow, therefore, reads the Patent Applications as claiming only Materials and, as a result, being owned solely by Dow.

Dow's interpretation of the JDA suffers from at least one serious shortcoming. Namely, Dow ignores part of the definition of Materials. Dow points to the portion of the definition beginning with the word "compounds." As is clear from the full definition, however, that subpart of the definition comes from an indicative list, set off in a parenthetical, of polymeric materials.[46] In fact, the portion of the definition from which Dow derives support for its argument can be excised without the definition losing meaning. Read in this manner, the definition would state: "'Material,' as used with respect to a particular Project, means (a) those particular polymeric materials . . . as well as (b) any other chemicals or compositions useful with those polymeric materials, all as more specifically defined to be the 'Material' in the corresponding Addendum."[47] Excluding the indicative parenthetical only clarifies that the meaning of the term Materials depends upon what is listed in the Addenda.

There were four Projects under the JDA, each of which resulted in an Addendum numbered one through four. The relevant parts of those Addenda are identical. Each lists three Materials in bullet points: (1) Non-commercially available Bluewave™ Polyolefin Dispersions; (2) Non-commercially available Polyolefins (functionalized); and (3) Non-commercially available Polyolefins (un-functionalized). According to Akzo,

---

[46]     *See supra* note 24 and accompanying text.

[47]     JDA ¶ 11.18.

17

these three versions of Polyolefins were the Materials. Thus, under Akzo's interpretation, because the Patent Applications claim compositions comprising additional items—*e.g.*, stabilizing agents, crosslinking agents, and acrylic emulsions—the Patent Applications do not claim only Materials. Akzo's Complaint alleges that the compositions comprising these other non-polyolefin items resulted from the JDA and at least partially are owned by Akzo.

At this preliminary stage in the litigation, I cannot say that Akzo's reading is unreasonable. Dow's interpretation, at least on the record currently before me, arguably sweeps too broadly. It seeks to define Materials as comprising polymeric materials and "any other chemicals or compositions useful with those polymeric materials" without reference to the appropriate Addendum. The universe of other chemicals or compositions that are "useful with" polymeric materials seemingly could be limitless and would result in interpreting Material in such a manner that it likely would encroach on the other JDA definitions, such as Product. An interpretation of Material that unnecessarily rendered other terms of the JDA surplusage would be unreasonable.[48]

The clear language of the definition of Materials therefore supports the conclusion that Akzo's interpretation of that term is reasonable. Under Akzo's interpretation, it is

---

[48] *E.g.*, *Commercial Bank v. Global Payments Direct, Inc.*, 2014 WL 3567610, at *8 (Del. Ch. July 21, 2014) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein, in order not to render any part of the contract mere surplusage, and, if possible, reconcile all the provisions of the instrument." (internal quotations and footnotes omitted)) (collecting cases).

18

reasonably conceivable that the Patent Applications claim non-Material JDA-Inventions, which are at least co-owned by Akzo. Phrased differently, it is reasonably conceivable that Akzo could prove at trial that the Patent Applications claim at least certain Products, which would be JDA-Inventions co-owned by Akzo.[49] Accordingly, it would not be appropriate to dismiss Akzo's breach of contract count or its declaratory judgment count.

### 2. Akzo's confidential information

Akzo alleges that the Patent Applications "disclose Akzo's confidential information regarding polyolefin dispersions, acrylic latex emulsions and the use of phenol formaldehyde."[50] Dow derides these allegations as so vague that they fail to place Dow on notice of what Akzo is alleging, thereby violating Court of Chancery Rule 8.[51] In making that argument, however, Dow appears to be invoking a heightened pleading standard, despite its protestations to the contrary. But, there is no requirement that improper disclosure of confidential information be pled with particularity.[52] Rather, the

---

[49] Akzo technically has preserved its argument that the Patent Applications claim Target-Coatings, which would be wholly owned by Akzo. There are no allegations, however, that any Target-Coatings ever were created under the JDA.

[50] Compl. ¶ 22.

[51] Ct. Ch. R. 8 ("A pleading . . . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief . . . .").

[52] *See* Ct. Ch. R. 9 (listing pleadings that require more specificity or particularized allegations).

applicable standard in Delaware is notice pleading, which is a minimal pleading standard.[53]

Akzo alleges that, in violation of the confidentiality provisions in the JDA, Dow disclosed Akzo's confidential information in the Patent Applications. The combined length of the two Patent Applications is slightly more than eighty typewritten pages. The categories of Akzo's confidential information that Dow allegedly misused or disclosed relate to polyolefin dispersions, acrylic latex emulsions, and the use of phenol formaldehyde. These allegations adequately place Dow on notice of the claims against it. To respond to those allegations, Dow needs to examine the finite universe of the Patent Applications and focus on the disclosures and claims that pertain to one or more of those three categories of allegedly confidential information.

Dow further argues that Akzo's allegedly confidential information previously was disclosed publicly. If Dow succeeds in proving that, then Dow could not have breached the JDA by disclosing such information.[54] In particular, Dow points to earlier-filed patents that include the phrases "aqueous polymer dispersion," "acrylic polymers," and "phenol formaldehyde."[55] These general phrases, however, do not prove that the information Akzo accuses Dow of improperly using or disclosing was in the public

---

[53]     *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[54]     JDA ¶ 11.6 (excluding publicly available information from the definition of Confidential Information).

[55]     Dow's Opening Br. 19 and Exs. 4-5.

20

domain. Akzo's claim may involve more specific disclosures within those three categories, but those details will need to await development of the record in discovery. In addition, whether the allegedly confidential information already was in the public domain and, therefore, was not Confidential Information under the JDA, constitutes a disputed issue of fact that cannot be resolved on a motion to dismiss. In sum, because Delaware requires only notice pleading as to Akzo's confidential information clams,[56] Dow's motion to dismiss that claim is denied.

## D. The Remaining Counts

Thus far, I have declined to dismiss Count I and II. The remaining Counts III-V, respectively, are for breach of the implied covenant of good faith and fair dealing, conversion, and unjust enrichment. Dow argues that each of these counts fails to state a claim because the JDA governs the entirety of the relationship between the parties and these claims are merely duplicative of Counts I and II. I agree.

### 1. Breach of the implied covenant of good faith and fair dealing

"The implied covenant of good faith and fair dealing inheres in every contract and 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving

---

[56] *See Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 978-79 (Del. Ch. 2004) (noting Delaware's "lenient pleadings standards on a motion to dismiss" and allowing to proceed a sparsely pled claim for violation of a contractual duty to protect and not misuse confidential information).

21

the fruits of the bargain."[57]  "The 'implied covenant of good faith and fair dealing involves . . . inferring contractual terms to handle developments or contractual gaps that . . . neither party anticipated.'  It does not apply when the contract addresses the conduct at issue."[58]  The implied covenant "is recognized only where a contract is silent as to the issue in dispute."[59]  It is not a tool to re-write contracts and it "cannot be invoked to override the express terms of the contract."[60]  Indeed, "courts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it."[61]  Thus, to state a claim for a breach of the implied covenant, Akzo "must allege a specific implied contractual obligation and allege how the violation of that obligation denied [it] the fruits of the contract."[62]

In its briefing and at the Argument, Akzo explained that its implied covenant claim focuses on the timing of Dow's unilateral termination of the JDA: before the Projects could be completed, but after Dow had gained access to Akzo's Confidential

---

[57]  *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

[58]  *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.2d 878, 896 (Del. 2015) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)) (footnotes omitted).

[59]  *AQSR India Private, Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

[60]  *Kuroda*, 971 A.2d at 888.

[61]  *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006).

[62]  *Kuroda*, 971 A.2d at 888.

Information, techniques, and know-how, which Dow then misappropriated for itself.[63]

These arguments, however, do not correspond to the allegations Akzo made in the Complaint in support of its claim for breach of the implied covenant of good faith and fair dealing. Having chosen to stand on its Complaint rather than amend it, Akzo must live with that decision.[64]

In the Complaint, Akzo cites four bases for its implied covenant claim. They are that Dow allegedly: (1) unilaterally filed for patents based on "the information arising from or related to research, development, data, information, knowledge, know-how, products and inventions resulting from the composition, use or application of certain coatings or other results of JDA activities";[65] (2) unilaterally disclosed Akzo's confidential information over Akzo's objections; (3) failed to "honor the purpose and intent of the JDA such that the contemplated and anticipated" output resulting from the joint venture "would be preserved and protected for the benefit of Akzo and not marketed or revealed as Dow's own";[66] and (4) "usurp[ed] to itself and for its own benefit intellectual property entrusted to it by Akzo with the understanding and reasonable

---

[63]     Akzo's Opp'n Br. 19-20; Arg. Tr. 54-56.

[64]     Ct. Ch. R. 15(aaa).

[65]     Compl. ¶ 37(a).

[66]     *Id.* ¶ 37(c).

23

expectation that Akzo's rights and interests therein would be protected."[67]  All of these allegations are covered by express provisions of the JDA.

First, as detailed in the preceding Section, the JDA includes specific provisions governing Confidential Information.  I already have concluded that Akzo adequately stated a claim for breach of the JDA relating to misuse of its Confidential Information. Second, the JDA explicitly addresses which party owns what JDA-Inventions and, as I previously held in this Memorandum Opinion, Akzo sufficiently stated a breach of contract claim in that regard.  I do not understand the Complaint to accuse Dow of taking something else that is neither a JDA-Invention nor an aspect of Akzo's Confidential Information.

Based on its position at the Argument and in its briefing, Akzo also appears to allege that Dow unfairly exercised its discretion to terminate the JDA in an effort to cut short development of potential Target-Coatings.  Viewing the allegations in the light most favorable to Akzo, Plaintiff asserts that Akzo's scientists would have developed Target-Coatings, but Dow prematurely terminated the JDA and left Akzo with, at best, a JDA-Invention jointly owned by it and Dow, rather than a Target-Coating that would have been wholly owned by Akzo.  In this manner, Dow allegedly deprived Akzo of the benefit of its bargain under the JDA.

Even assuming this is what Akzo in fact is attempting to argue in connection with its implied covenant claim, the Complaint does not contain factual allegations supporting

---

[67]     *Id.* ¶ 37(d).

24

such a theory.  The supposed wrongful termination of the JDA is the only theory under which Akzo conceivably could state an implied covenant claim in light of its other allegations, all of which expressly are covered by the JDA's terms.  Aside from the allegations in Paragraph 37, which are quoted or summarized *supra*, the only relevant allegation relating to the termination of the JDA states: "On or about October 24, 2011, Dow provided Akzo with notice of termination of the JDA under paragraph 9.5.  The JDA thereby terminated by its own terms ninety (90) days after said notice."[68]  This allegation says nothing about how Dow deprived Akzo of the benefit of the JDA.  Indeed, it does not even allege that the termination was wrongful.  Thus, based on the allegations in Akzo's Complaint—as opposed to the positions it advanced in its briefing and at the Argument—I find that it is not reasonably conceivable that Akzo could prove a breach of the implied covenant of good faith and fair dealing.[69]

## 2. Conversion

"Conversion is 'any distinct act of dominion wrongfully exerted over the property of another, in denial of [that person's] right, or inconsistent with it.'"[70]  Conversion, however, is a tort.  "Under Delaware law, 'where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent

---

[68]   Compl. ¶ 17.

[69]   With respect to the allegations explicitly governed by the JDA, Akzo's relief, if any, will be from its breach of contract claim.  The same allegations cannot form the basis of an implied covenant claim.  *AQSR*, 2009 WL 1707910, at *11.

[70]   *Kuroda*, 971 A.2d at 889 (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)).

duty imposed by law, a plaintiff must sue in contract and not in tort.'"[71] "Thus, in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract."[72]

In Count IV of the Complaint, Akzo accuses Dow of conversion. In support of that claim, Akzo alleges that, without its permission or consent, Dow "intended and continues to deprive Akzo of the research, development, data, information, knowledge, know-how, product and inventions resulting from the composition, use, or applications of certain coatings and JDA inventions permanently and did so permanently deprive Akzo of its interests in its intellectual property."[73] The crux of these allegations is that Dow misappropriated confidential information and JDA-Inventions that are at least partially owned by Akzo. All of these allegations are covered explicitly by the JDA, as already discussed. Indeed, the conversion allegation specifically references JDA-Inventions, a term with no meaning outside the context of the JDA. Akzo has not identified or pled the existence of any independent duty violated by Dow that existed apart from the contractual duties imposed by the JDA. Accordingly, I grant Dow's motion to dismiss Count IV.

---

[71]     *AQSR*, 2009 WL 1707910, at *12 (quoting *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at *5 (D. Del. May 24, 2001)).

[72]     *Kuroda*, 971 A.2d at 889.

[73]     Compl. ¶ 42.

### 3. Unjust enrichment

Akzo's alternatively pled unjust enrichment count suffers from the same flaws as its conversion claim: the purported wrongs are covered by the JDA. "The elements of unjust enrichment . . . [are]: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."[74] "Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract."[75] Accordingly, a "claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[76]

According to the Complaint:

> Akzo provided Dow with its confidential information relating to the development of protective coatings for metal beverage and food package containers with the express understanding and reasonable expectation that the confidentiality of the information provided would be protected and that Akzo's rights, research data, results and inventions resulting from the use of those compounds would be protected as contemplated by the JDA.[77]

The information Akzo provided to Dow was supplied in the context of the parties' joint-development venture. That venture was governed by the JDA, which had specific

---

[74]  *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 326686, at *6 (Del. Ch. June 16, 1998).

[75]  *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).

[76]  *Kuroda*, 971 A.2d at 891.

[77]  Compl. ¶ 48.

provisions dealing with Confidential Information, ownership of JDA-Inventions, and patenting procedure, among other things. Akzo's unjust enrichment allegation specifically references the JDA and does not invoke any cognizable legal or equitable rights arising from outside the JDA. Because the actions complained of in Akzo's unjust enrichment count are governed by the JDA, I conclude that it must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Dow's motion to dismiss is granted in part and denied in part. Specifically, Counts III, IV, and V are dismissed, but the motion is denied as to Counts I and II.

**IT IS SO ORDERED.**